## CIRCUIT COURT OF FLUVANNA COUNTY

J. Dean McOsker

v.

Asa D. Brown et al.

June 23, 1958

Ended File No. 697

BY JUDGE LYTTLETON WADDELL

The facts in the case seem to me entirely undisputed. I find no substantial difference in the statements of the facts contained in the three memoranda submitted by counsel for all parties. Briefly stated, the facts are as follows.

Brown, an automobile dealer in Fork Union, sold to Hubbard, a dealer in Richmond, on September 12, 1957, three automobiles, including the Plymouth which is the subject of the controversy. Although a check was given for the purchase price, Brown was advised that the check was not good, so that, in effect, the sale was on credit. Hubbard took the cars with the title certificates to Richmond, advising Brown that he would finance the cars and make the check good.

Two of the cars were financed by Hubbard with the Savings Bank & Trust Company and the liens duly noted on the certificates of title issued in the name of Hubbard.

The third car was financed in a somewhat unusual way. It appears that Hubbard had been using the credit of the complainant McOsker in order to finance several cars with the Central National Bank. In this case, as in previous cases, the title was assigned to McOsker who went to the bank, borrowed $2,200.00, executed a chattel deed of trust and an application for a title certificate. The proceeds of the loan were made available to Hubbard, but he did not, as he had promised, use this money or that received from the other transactions to make Brown's check good.

McOsker testified that the bank knew he was financing the car for Hubbard as he had done ten or fifteen times before; that Mr. Warner, the

officer of the bank who handled the transaction, knew that the car was to be left on Hubbard's lot for sale as a part of his stock.

Mr. Warner testified that he knew the car was to be resold but did not know by whom. On cross-examination, he admitted that he knew previous transactions were for Hubbard's account and that he did not know of any other dealer for whom McOsker acted.

Although the transaction at the bank was completed September 13, 1957, the new certificate of title in McOsker's name showing the lien in favor of the bank was not issued until October 2, 1957.

In the meantime, Brown came to Richmond to find out why his check had not been made good. He went to Hubbard's lot but did not see Hubbard. He found all three cars on Hubbard's lot. He then went to the Division of Motor Vehicles and found that title certificates of all of the cars were in Hubbard's name with liens recorded in favor of the Savings Bank & Trust Company noted on two of them. He returned to Hubbard's lot, where Hubbard's brother, a salesman for Hubbard, agreed that he might take the apparently unencumbered vehicle at what he had sold it for. Walter Hubbard executed the customary instrument, called a bill of sale, but actually in the nature of an order, showing the agreed purchase price, and Brown took the car back to Fork Union.

Although Walter Hubbard undertook to testify that he had no authority to execute the bill of sale, or order, he also testified that, when his brother returned, he told him of the transaction, and no objection was raised.

The present proceeding is brought by McOsker for the purpose of determining the rights of the parties and enforcing the lien.

Two questions of law are presented, namely:

I. Whether the lien of the bank was void as to Brown so that he acquired good title to the car?

II. Whether, if Brown has good title, McOsker's liability to the bank is discharged by the bank's failure to record its lien promptly?

It is conceded by all parties that if the car in question had been sold by Hubbard to some purchaser other than Brown, in the ordinary course of business, the purchaser would have acquired good title. *General Credit, Inc. v. Winchester, Inc.*, 196 Va. 711, 85 S.E. 207 (1955); *Boice v. Finance & Guaranty Corp.*, 127 Va. 563, 102 S.E. 591 (1920).

It is claimed, however, that the transaction between Brown and Hubbard was not in the ordinary course of business and that the rules laid down in the

two cases above cited, therefore, are not applicable. Cases from other jurisdictions are cited by counsel on both sides.

I do not think it is necessary to go beyond the Virginia decisions for authorities governing this case. I think some confusion in the minds of the attorneys and the Court may have resulted from the use of the phrase "sale in the ordinary course of business."

Under the statutes applicable in cases from other jurisdictions, the term "ordinary course of business" may have special importance. And it happens that, in both the Virginia cases above cited, purchasers in the usual course of business were involved.

However, these two cases are merely recent examples of a rule of law established by a long line of Virginia cases, beginning with *Lang v. Lee*, 24 Va. (3 Rand.) 410 (1825). This rule, as I read the cases, is to the effect that a mortgage on property left in the possession of a merchant for sale as a part of his stock is void as to both purchasers and creditors. Of course, the purchaser must give value. But in this case, Brown did give value. By accepting the automobile, he released to the extent of $2,200.00 his claim against Hubbard.

The facts in *Lang v. Lee*, 3 Rand. 410, are quite analogous to the facts of this case. There the merchant, Lee, had given to Lang, a creditor, a mortgage on his stock of goods. Tierney & Sons, also creditors, who had supplied Lee with goods, as Brown had supplied Hubbard, also subsequently took a mortgage on the stock of goods and took them on to possession for the purpose of sale. Lang undertook to enjoin the sale. It was held that the rights of Tierney & Sons, creditors and not in any sense purchases in the usual course, were superior to those of Lang.

If a mortgage on a stock of goods is void as to a creditor who accepts a voluntary lien thereon, *a fortiori*, it is void as to a creditor who takes title to the goods in settlement of his debt.

One matter which suggests a distinction between our case and the case of *Lang v. Lee, supra*, is the fact that Brown knew that Hubbard proposed to put a lien on the car. Assuming that a necessary element of the invalidity of the bank's lien is that Brown had no notice thereof, his agreement with Hubbard at the most put him on inquiry. He did make a reasonable inquiry and had no notice, actual or constructive, of the supposed lien.

And indeed, whether notice is important may be doubted. Notice was suggested in the pleadings in *Lang v. Lee, supra*, but was not discussed in the opinion. Certainly as to a creditor who became such before the lien attached notice is immaterial. And if any creditor of Hubbard had levied on or attached the car on Hubbard's lot, his lien would, under the Virginia decisions, have been prior to that of the bank.

So if Brown had accepted in satisfaction of the debt any other car on Hubbard's lot, similarly financed, he would have taken good title.

And to carry the discussion one step further, if Brown or any other purchaser had inquired of Hubbard whether the car was subject to a lien and Hubbard had told him that it was but that he had a right to sell it, this would have been an accurate statement of the legal situation on which, it seems to me, Brown or any other purchaser would have a right to act.

It is argued for McOsker and the bank that in some way Brown assisted in, or made possible, a fraud on the bank and that, therefore, on equitable principles, he should not be allowed a priority. The argument seems to me without merit. Brown in his original transaction did nothing except, in effect, to sell to Hubbard on credit. This may have been imprudent, but certainly not fraudulent. His subsequent act was only that of a creditor who has taken a bad risk undertaking to secure himself. The bank on the other hand has, by taking an invalid lien, put Hubbard in the position to defraud it. Even if Brown were at fault, the bank is also delinquent, and the maxim of *in pari delicto potior est conditio defendentis* should apply.

I am of the opinion that the bank's lien was void as to Brown and that he took good title to the automobile from Hubbard.

Having reached this conclusion, it becomes necessary to determine whether McOsker's liability to the bank was discharged by the failure to have a certificate of title issued with the lien noted thereon.

The equities are very much in his favor, for it appears from the admitted facts that, had the lien been recorded, Brown would not have undertaken to remove the car. But the legal situation is such that he cannot be discharged for two reasons.

In the first place, although the bank had knowledge that the transaction with McOsker was for the benefit of Hubbard, it was not a transaction involving suretyship. The bank dealt only with McOsker, looked only to him, and had no rights against Hubbard, except to take the car. There was, therefore, no duty on the bank to record the lien or preserve the security for the benefit of McOsker. The principal debtor, indeed the only debtor so far as the bank was concerned, was McOsker.

And secondly, as counsel for the bank point out, the real reason for the loss of the security was not the failure to record but the type of security taken. It is a mere coincidence that Brown was the purchaser of the car and that he inquired of the Division of Motor Vehicles whether the car was subject to a lien. The true cause of the loss was leaving the car in Hubbard's possession with an implied power of sale. And in this act, McOsker participated. He is therefore not discharged.